IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR 13-01249-TUC-CKJ(HCE) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| vs. | |
| Amanda Henley, | |
| Defendant. | |

Pending before the Court is Defendant's Motion To Suppress/Dismiss For Lack Of Reasonable Suspicion (Doc. 30). The Government filed a Response To Defendant's Motion To Suppress/Dismiss For Lack of Reasonable Suspicion (Doc. 36).

Defendant's motion came on for hearing on August 27, 2013 and September 12, 2013. Border Patrol Agents (hereinafter "BPA") Jeremy Hampton (hereinafter "Hampton at p. _"), Diego Omar Ochoa (hereinafter "Ochoa at p. _"), and Leonardo Gonzales (hereinafter "Gonzales at p. _") testified for the Government. Admitted into evidence were Government Exhibits 1 and 2: Google maps of southeastern Arizona. Transcripts of the August 27, 2013 and September 12, 2013 evidentiary hearings were ordered, filed on September 24, 2013 (Docs. 47, 48), and are forwarded to the District Court for review.

After review of Defendant's motion and the Government's response, consideration of testimony given, exhibits admitted into evidence, and argument proffered, the Court

1 recommends that Defendant's Motion To Suppress/Dismiss For Lack Of Reasonable
2 Suspicion (Doc. 30) be granted.

## I. PROCEDURAL AND FACTUAL BACKGROUND

### A. Indictment

It is alleged in three counts that on or about June 19, 2013, at or near Wilcox, in the District of Arizona, Defendant was in knowing and reckless disregard of the fact that three aliens had come to, entered and remained in the United States in violation of law, and did transport and move said aliens within the United States by means of transportation, and did so for the purpose of commercial advantage and private financial gain, in violation of 8 U.S.C. §1324(a)(1)(A)(ii) and (a)(1)(B)(I), (Counts 1, 2, 3). (Doc. 20).

### B. Facts

On Wednesday, June 19, 2013 at approximately 7:00 a.m. BPAs Hampson as driver and Ochoa as a passenger, were in a marked Border Patrol vehicle positioned facing west at the southeast corner of the T-intersection of Apache Pass Road and State Route (hereinafter "SR") 186 to observe traffic. (Hampson at pp. 16-17; Ochoa at p. 60). This intersection is a distance northwest of the Chiricahua National Monument gated entrance to the park. (Hampson at pp. 25; Ochoa at p. 76). BPA Ochoa is unsure of the visitation hours at the park which apparently vary based upon the time of year. (Ochoa at p. 76). At 7:20 a.m., Defendant was observed driving a Volkswagen sedan (hereinafter "VW") northwest on SR 186 towards Willcox. (Hampson at pp. 18). The driver, later determined to be Defendant, looked relaxed and held a cell-phone in her right hand with her left hand on the steering wheel. (*Id.* at pp. 18, 20, 35). The driver appeared to be covering her face. (*Id.* at pp. 40, 47). BPA Hampson found it suspicious that the female front seat passenger sat erect. (*Id.* at pp. 18, 19, 40). BPA Hampson states that the back of the passenger seat in which she sat was also erect. (*Id.* at p. 19).[1] Neither the driver or passenger looked at or acknowledged the BPAs. (*Id.* at pp. 40-41,

---

[1] BPA Hampson's testimony that the passenger sitting erect in the erect-back passenger seat was "suspicious" without more explanation as to what that connotes, cannot carry any

- 2 -

1  43). BPAs Hampson and Ochoa opine that local residents will acknowledge BPA presence
2  while someone who may be a tourist would not be expected to do so. (*Id.* at p. 18; Ochoa at
3  pp. 62, 69).[2]

4  BPAs Hampson and Ochoa proceeded to follow the VW because it had a sticker
5  indicating it was a rental vehicle. (Hampson at pp. 32, 44, 45, 51; Ochoa at p. 63). The VW
6  was followed for 25 miles. (Hampson at p. 41). BPA Hampson found this suspicious because
7  anyone driving in the area for tourist activities would be driving south and not north at that
8  hour of the morning. (*Id.* at p. 39). The VW was not pulled over when it initially passed
9  BPAs Hampson and Ochoa's position at Apache Pass Road and SR 186 because there was
10 no reason to.(*Id.* at pp. 32, 43). BPAs Hampson and Ochoa passed the VW to look into it and
11 noted that Defendant and passenger were seated as seen before. (*Id.* at pp. 20-21). After
12 passing Defendant, BPAs Hampson and Ochoa pulled over to the side of SR 186, ran a
13 license plate check on the VW, which came back as registered to a rental company out of
14 Virginia Beach, Virginia, at which time BPA Hampson decided to stop the VW. (*Id.* at p.21).
15 The sedan was subsequently stopped just outside of Willcox, 25 miles from where it had first
16 been seen. (*Id.* at pp. 29, 31). Other than driving 50 mph in a 55 mph zone on SR 186, no
17 traffic violations were observed by BPA Hampson and Ochoa. (*Id.* at pp. 30, 35).

18 On June 19, 2013, BPAs Hampson and Ochoa had been working the midnight to 8:00
19 a.m. shift out of the Willcox BP station. Prior to beginning their shift, they had received
20 intelligence reports regarding stops in the area. (*Id.* at p. 36). Intelligence developed by BPA
21 Gonzales discerned apprehension of smugglers on Tuesdays, Thursdays, and Sundays. (*Id.*
22 at. 38). BPA Hampson concedes that Defendant was stopped on a Wednesday. (*Id.*). Other

---

weight in the determination of whether reasonable suspicion existed to stop Defendant.

[2]Both BPA Hampson and Ochoa testified that people from the area, i.e., "locals", will acknowledge them by waving or nodding to them when they are seen. (Hampson at pp. 17-18; Ochoa at p. 62). Whether Defendant and/or her passenger did or did not acknowledge BPAs Hampson or Ochoa will not weigh in the balance of whether there existed reasonable suspicion. *Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1446-1447 (9th Cir. 1994).

- 3 -

1  intelligence from BPA Gonzales was that out of a 24-hour day, vehicles had been stopped
2  in the course of 13 hours (5:45 a.m. to 10:45 a.m.; noon to 6:00 p.m.; and 6:30 p.m. to 8:30
3  p.m.). (*Id.* at p. 36). Furthermore, smuggling organizations appeared to have timed their
4  activity for BP shift changes and had utilized rental vehicles as well as personal vehicles. (*Id.*
5  at pp. 19, 40; Ochoa at pp. 63, 70). It is agreed by BPAs Hampson and Ochoa that tourists
6  rent vehicles as well. (Hampson at p. 35; Ochoa at p. 68).

7  BPAs Hampson and Ochoa relied on intelligence reports provided by BPA Gonzales
8  on smuggling activity he perceived was occurring in the area. (Hampson at p.12-13; Ochoa
9  at 58). The intelligence reports attempt to outline trends of activity. (Hampson at p. 13). In
10 this instance a perceived "trend" was that smuggling organizations were using rental vehicles
11 and attempting to circumvent the BP checkpoint on SR 191 by utilizing SR 181 and SR 186
12 during shift change. (*Id.* at pp. 13-14, 15-16). Intelligence reports indicated six alien
13 trafficking interceptions had occurred in SR 181 and SR 186. (*Id.* at p. 40). Intelligence
14 reports relied upon by BPA Hampson referenced stops that occurred between 5:45 a.m. to
15 10:45 a.m. inclusive of stops occurring between 6:00 a.m. and 8:00 a.m. as well as during
16 6:30 p.m. to 8:30 p.m. (*Id.* at p. 36). Intelligence reports provided by BPA Gonzales
17 suggestion of alien smuggling occurring on Tuesdays, Thursdays, and Sundays, was not a
18 trend but rather just for purposes of visibility. (*Id.* at pp. 28-29, 38).

19 BPA Gonzales, an intelligence agent since spring of 2008, reviews ninety to ninety-
20 five percent of reports produced daily at the Willcox BP station. (Gonzales at pp. 5, 15). He
21 attempts to discern a trend, a tactic, or a pattern based on commonalities being used to
22 circumvent BP operations. (*Id.* at p. 6). "Commonalities" BPA Gonzales discerned were: 1)
23 time of day or night; 2) route taken; 3)type of vehicle used; 4) registered owner; 5) area
24 vehicle was coming from; 6) use of rental vehicle; and 7) caucasian male or female drivers
25 from Phoenix area. (*Id.* at p. 8). He further defines a "trend" as four to six encounters over
26 a two-week to a month period. (*Id.* at p. 6). BPA Gonzales opines that in the four to six
27 encounters, the vehicles were initially registered out of Scottsdale, Arizona, then registration
28

1 "ballooned" to the whole Phoenix area. (*Id.* at p. 10).[3]

2       BPA Gonzales did not attend any special schooling to become an intelligence agent; does not have a college degree; and simply applied to become an intelligence agent but has no idea what criteria is needed to qualify. (*Id.* at pp. 12-13). Though not schooled in statistical analysis, BPA Gonzales relies upon "data analysis", i.e., collection of data and attempting to discern commonalities. (*Id.* at p. 15). BPA Gonzales concedes that although there is statistical data available, he does not know if such would indicate similar demographic characteristics to people stopped for smuggling and who actually were not, and chose not to consider such, concentrating instead on only those arrested. (*Id.* at pp. 21-22). BPA Gonzales concedes that data analysis consisted of: 1) a noon to 6:00 p.m. window where smuggling activity had occurred; 2) no listing of the number of vehicles considered; 3) a reference to five load vehicles but no consideration of the time frame within which such were stopped; 4) drug addicts were used to drive the vehicles; and 5) rental and personally owned vehicles were used for smuggling. (*Id.* at pp. 24-26). Another time frame considered by BPA Gonzales was 5:45 a.m. to 10:45 a.m. where drivers were using maps, but concedes he cannot tell when a driver is using a map as a vehicle drives by. (*Id.* at p. 27).

17       In January of 2013, BPA Gonzales discerned that alien smuggling organizations were not utilizing SR 181 and SR 186 as much, but instead were using SR 80. (*Id.*). By June of 2013, BPA Gonzales discerned that the perceived time frames utilized by smuggling organizations were 6:00 a.m. to 8:00 a.m. and 6:30 p.m. to 8:30 p.m. (*Id.* at p. 28). There are four shift changes in the area, one of which ends at 8:00 a.m. (*Id.* at p. 9). Furthermore, the time frames suggested that smuggling was occurring on Tuesdays, Thursdays and Sundays. (*Id.* at p. 30). Ostensibly, these specific days were "... more visibility than it was a trend, as far as the days of the week go." (*Id.* at pp. 28-29):

        Q. (Defense counsel): So this goes back to the criteria that I was

---

[3] BPA Hampson, while following the VW SR 181, ran a registration check on the vehicle: "It came back to a rental car company out of Virginia Beach, Virginia." (Hampson at p. 21).

- 5 -

> asking you before, and this is why I wanted to nail you down on this. How do you decide when you're going to put information like this in the email or not? What is it about the information that makes it worth putting in the email or not putting in the email?
> A. (BPA Gonzales): I guess it's just whatever I feel or one of my partners feels they just need. There have been times we've been - - we've put out information, and something didn't seem like it was valuable that turns out to be valuable at a later time.
> Q. (Defense counsel): Okay. So what you're telling me is that there is no procedure, manual, or other written criteria for the determination of how or when this data might be considered valuable.
> A. (BPA Gonzales): No.
> Q. (Defense counsel): It's made up by you.
> A. (BPA Gonzales): Yes.

(*Id.* at p. 29).

BPA Gonzales concedes that in his report of June 18, 2013, i.e., the day before Defendant's arrest and detention, that: 1) there was no indication of the number of stops conducted on SR 181 and SR 186; 2) not everyone stopped was smuggling;[4] 3) and stops occurred between 6:00 a.m. and 8:00 a.m. or between 5:45 a.m. and 10:45 a.m.; 4) drivers were either in a rental vehicle or a personally owned vehicle; and 5) could have been stopped on SR 80 or SR 181. (*Id.* at pp. 30-31).

## II. DISCUSSION

### A. Law

Law enforcement may conduct an investigatory stop based upon reasonable suspicion that a suspect is engaging in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21 (1968)(investigatory stop valid when law enforcement observed defendants acting in manner consistent with defendants contemplating robbery); *United States v. Cortez*, 449 U.S. 411 (1981); *United States v. Drake*, 543 F.3d 1080, 1088 (9th Cir. 2008). Reasonable suspicion

---

[4]Since a report does not issue when a stop occurs and no contraband is found and the subject is free to go, BPA Gonzales does not know if there was or was not reasonable suspicion to stop that vehicle. (Gonzales at p. 37). Consequently, BPA Gonzales analysis is based strictly on presumed factors he attributes to only people arrested without distinguishing factors of people presumably lawfully stopped and determined not to be violating the law. (*Id.* at p. 38).

- 6 -

1 cannot be founded on inarticulable hunches or general suspicions. *Ybarra v. Illinois*, 444 U.S. 2 85, 92-93 (1079)(no reasonable suspicion to detain unarmed patron despite warrant to search 3 tavern and generalized suspicion that drug transactions had occurred therein). Investigatory 4 stops are valid if reasonable suspicion objectively exists. *United States v. Arvizu*, 534 U.S. 5 266, 273 (2002)(court must determine if law enforcement had a "particularized and objective 6 basis" for reasonable suspicion); *United States v. Berber-Tinoco*, 510 F.3d 1083, 1088-89 (9th 7 Cir. 2007)(valid vehicle stop based upon objective reasonable suspicion: after activation of 8 seismic device, law enforcement soon thereafter saw vehicles in area known for presence of 9 undocumented aliens, vehicles traveled slowly, braked periodically, and area was an alien 10 pick-up staging site).

11 The "particularized and objective basis" is law enforcement's personal observations 12 and law enforcement's knowledge that a crime has been committed. *Illinois v. Wardlow*, 528 13 U.S. 119, 124-25 (2000)(reasonable suspicion based upon law enforcement observation of 14 unprovoked flight by suspect holding opaque bag); *United States v. Hensley*, 469 U.S. 221, 15 232-35 (1985)(reasonable suspicion to stop vehicle driven by suspected accomplice in 16 robbery based upon an other law enforcement bulletin); *see also Drake*, 543 F.3d at 1088 17 (reasonable suspicion to stop when law enforcement: observed speeding vehicle at night on 18 road leading from recently robbed store, smelled burning fluid indicating vehicle driven 19 quickly, and driver looked at officers in odd manner); *Berber-Tinoco*, 510 F.3d at 1088. In 20 determining whether reasonable suspicion exists, a "totality of the circumstances" test is 21 applied. *Arvizu*, 534 U.S. at 275-77; *see also Cortez*, 449 U.S. at 417.

22 Courts accord great deference to the observations and conclusions of law enforcement, 23 reasoning that an officer, by experience and training, can infer criminal activity from conduct 24 seemingly innocuous to a lay person. *Arvizu*, 534 U.S. at 277; *Berber-Tinoco*, 510 F.3d at 25 1088-89; *United States v. Camargo*, 208 F.3d 1122, 1131 (9th Cir. 2000). Experience alone 26 may not be used to give an officer unbridled discretion in making a stop. *Nicacio v. INS*, 797 27 F.2d 700, 705 (9th Cir. 1986), *overruled in part on other grounds by Hodgers-Durgin v. De* 28 *La Vina*, 199 F.3d 1037 (9th Cir. 1999). The inferences that law enforcement draw based

1  upon their training and experience "must also be grounded in objective facts and be capable
2  of rational explanation." *United States v. Rojas-Millan*, 234 F.3d 464, 469 (9th Cir. 2000).
3  Inferences may not be drawn on isolated or *de minimus* instances of otherwise innocent
4  conduct. *United States v. Manzo-Jurado*, 457 F.3d 928, 939-40 (9th Cir. 2006)(no reasonable
5  suspicion to stop existed based upon seeing a group of Hispanic men appearing to be at work
6  and conversing in Spanish, then seeing defendant get into truck after he saw a Border Patrol
7  vehicle: defendant's actions did not distinguish him from group which is similar to many
8  lawful immigrants); *see also United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121 (9th
9  Cir. 2002)(law enforcement's generalizations, if accepted, cast suspicion on large segments
10 or entire categories of the law-abiding population).

11      On the other hand, seemingly innocent actions may cumulatively create reasonable
12 suspicion. *United States v. Sokolow*, 490 U.S.1, 9 (1989); *see also United States v. Johnson*,
13 581 F.3d 994, 1000 (9th Cir. 2009)(valid investigatory stop and frisk based upon reasonable
14 suspicion after observing two individuals entering bank, one putting sweatshirt hood up and
15 whispering to the other, while a third individual stayed in vehicle). A generalized concern
16 of criminal activity in an area and a person's presence there creates no reasonable suspicion.
17 *Brown v. Texas*, 443 U.S. 47, 52 (1979)(no reasonable suspicion to stop a person based solely
18 on that person's presence in an area known for drug activity).

19      **B.    Analysis**

20           **1.    Totality Of The Circumstances**

21      BPAs Hampson and Ochoa relied on intelligence discerned and communicated to
22 them by BPA Gonzales. A scrupulous examination of the basis for BPA Gonzales'
23 conclusions do not support his perceived commonalities. As an intelligence agent of over five
24 years, reviewing ninety to ninety-five percent of reports generated in the Willcox area by
25 BPAs, BPA Gonzales does not proffer any information that would support a claim that alien
26 smuggling vehicles in general are seen driving north on SR 196, veering east onto SR 181
27 and later seen traveling northwest on SR 186 towards Willcox. Nor do BPAs Hampson and
28 Ochoa offer any evidence that Defendant herself took such a route. In short, there is nothing

- 8 -

1 that supports the claim that Defendant sought to avoid the BP checkpoint north of the intersection of SR 196 and SR 181.

Defendant was stopped on a Wednesday. BPA Gonzales concedes that the commonality of when rental vehicles were stopped (Tuesday, Thursday and Sunday) would not suggest a trend at all. BPA Gonzales also concedes that both personally owned vehicles as well as rental vehicles are used in the Willcox area for alien smuggling.

BPA Gonzales concedes that in the weeks leading up to Defendant's arrest, it was unknown how many vehicles were stopped and not involved in smuggling which resulted in the vehicle driver's release. Law enforcement must have reasonable suspicion to stop a vehicle. In these instances the Court can only conclude that "reasonable suspicion" was but a hunch that did not pan out when stopped vehicles evidenced no smuggling had occurred and a self-fulling prophecy[5] when evidence of smuggling was found.

Inferences drawn by BPA Gonzales were unreasonable. *Cortez*, 449 U.S. at 418. Conclusions arrived at by BPA Gonzales were based on a broad and diffuse body of information not conducive to discerning trends or patterns.

BPA Hampson has worked at the Willcox Border Patrol station for three and one half years while BPA Ochoa has been there for five years. (Hampson at p. 8; Ochoa at p. 54). Both are aware that the Chiricahua National Monument is frequented by tourists. (Hampson at pp. 25-26; Ochoa at p. 61). BPA Hampson knows that SR 181 and SR 186 has been designated by the Arizona Department of Transportation as a historic scenic highway. (Hampson at p. 27). He has not, however looked into tourist traffic patterns for that area nor does he go there as a tourist. (*Id.* at pp. 27-28). Moreover, BPA Ochoa is aware that the time of year determines the visiting hours for the Chiricahua National Monument but cannot offer what that might have been on June 19, 2013. (Ochoa at p. 26). All BPAs Hampson and

---

[5] BPA Gonzales urges as a "commonality" that caucasian male and female drivers, as in the instant case, are used to drive vehicles for alien smuggling. (Gonzales at p. 8). Yet, neither BPA Hampson or Ochoa in their extensive testimony ever refer to that as a factor that was considered.

1 Ochoa can surmise is that a vehicle ostensibly driving to the Chiricahua National Monument 2 for tourist purposes would be driving south on SR 186 towards the monument. (Hampson at 3 p. 39; Ochoa at p. 70). BPAs Hampson and Ochoa had only been at the T-intersection of 4 Apache Pass Road and SR 186 for twenty minutes before they saw Defendant driving north 5 on SR 186. (Hampson at pp. 16, 37). No testimony was given by BPAs Hampson or Ochoa 6 as to where Defendant had been in the twenty minutes before being seen driving north on SR 7 186.

8 BPA Hampson saw Defendant for the first time as she was driving north on SR 186 9 past his location. (*Id.* at p. 20). He observed Defendant with a cell phone in her right hand 10 and suggests that Defendant appeared to be covering her face. (*Id.* at pp. 20, 40, 46, 47). BPA 11 Hampson does not offer any testimony to support this claim, e.g., that Defendant actions 12 were arguably a reaction to her having seen him, BPA Ochoa or the marked BP vehicle. BPA 13 Hampson's conclusion is belied by the fact that after Defendant drove by his position, he 14 followed her vehicle and later passed Defendant on Defendant's driver side and she still held 15 a cell phone in her right hand, i.e., she did not switch it to her left hand to keep him from 16 seeing her face. (*Id.* at p. 47).

17 BPAs Hampson and Ochoa sought to overtake and pass Defendant on SR 186 to get 18 a better look inside Defendant's vehicle and when doing so, saw nothing to suggest 19 smuggling. (*Id.* at pp. 20, 35; Ochoa at p. 64). While being followed by BPAs Hampson and 20 Ochoa in a marked BP vehicle, Defendant appeared to be looking at them in her rear-view 21 mirror. (Hampson at p. 20).[6] BPA Hampson suggests "she was driving well below the speed

---

[6] A driver's preoccupation with a law enforcement vehicle following him is a natural reaction and is insufficient to justify an investigatory stop. *United States v. Jimenez*, 173 F.3d 752, 755 (9th Cir. 1999); *United States v. Garcia-Camacho*, 53 F.3d 244, 247 (9th Cir. 1995)(*citing Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1447 (9th Cir. 1994)(" A driver's failure to look at the Border Patrol car [cannot be used to justify the agent's suspicion] since the opposite reaction, a driver's repeated glancing at a Border Patrol car, can also be used to justify the agent's suspicion. To give weight to the type of justification 'would put the officers in a classic 'heads I win, tails you lose' position [and] the driver, of course, can only lose. '"); *United States v. Robert L.*, 874 F.2d 701, 703 (9th Cir. 1989). Whether eye contact

- 10 -

limit. (*Id.* at p. 20). The speed limit is fifty-five miles per hour and BPA Hampson defines "well below the speed limit" to be Defendant driving "somewhere in the neighborhood of fifty miles an hour." (*Id.* at p. 30). BPA Hampson does not testify that Defendant's five-mile per hour slower but otherwise reasonable speed was a result of Defendant's reaction to seeing a BP vehicle following. It is not a traffic violation to drive five miles under the speed limit or use a cell phone while driving, and BPA Hampson did not observe Defendant committing any traffic violations. (*Id.* at pp. 32, 34-35). There was no erratic driving. (*Id.* at p. 35). Defendant appeared to be in a relaxed posture as she drove. (*Id.* at pp. 20, 35).

## III. CONCLUSION

The totality of the circumstances do not support reasonable suspicion to stop Defendant. Nothing observed by BPAs Hampson and Ochoa on June 19, 2013 supports an inference that Defendant was involved in criminal activity.

BPAs Hampson and Ochoa simply had a hunch that Defendant was involved in criminal activity because she was seen driving a rental vehicle during a shift change occurring some distance away. These two threadbare considerations had been communicated to them by BPA Gonzales as alleged intelligence regarding smuggling. Considering that personal vehicles are also used to smuggle aliens, by BPA Gonzales' reckoning, arguably *any* vehicle seen while a shift change is occurring would give rise to reasonable suspicion to stop that vehicle.

BPAs Hampson and Ochoa surmise that a rental vehicle used by a tourist should be traveling south on SR 186 to visit the Chiricahua National Monument. They had no idea of the visitation hours at the monument on June 19, 2013, which is determined by the time of year. They had no idea the route of travel Defendant had taken to be in the area or where Defendant had been in the brief twenty minute window they were parked at the T-

---

is suspicious or not is highly subjective and can devolve into a case of "damned if you do, equally damned if you don't." *United States v. Montero-Camargo*, 208 F.3d 1122, 1136 (9th Cir. 2000); *Nicasio v. INS*, 797 F.2d at 704; *United States v. Mallides*, 473 F.2d 859, 861 n. 4 (9th Cir. 1973).

- 11 -

1  intersection of Apache Pass Road and SR 186. Without more they concluded that the use of
2  a rental vehicle alone was in order to take advantage of a BP checkpoint shift-change. No
3  inference or deduction to support reasonable suspicion can be drawn from such scant
4  information. BPAs Hampson and Ochoa had but a generalized concern regarding criminal
5  activity in an area and the mere presence of a person there.

6  Reliance on BPA Gonzales' perceived trends in the area are further weakened by the
7  fact that rental vehicles were stopped on Tuesdays, Thursdays and Sunday. BPA Gonzales
8  pulls back from claiming such was a trend when impeached by the fact Defendant was
9  stopped on a Wednesday. (Gonzales at pp. 28-29). As part of a perceived trend, BPA
10 Gonzales also discerned that the six rental vehicles were registered initially out of Scottsdale,
11 Arizona then "ballooned" to registration out of Phoenix, Arizona in the weeks leading up to
12 Defendant's arrest. Six rental vehicles stopped in the weeks before Defendant was stopped,
13 on nearly half of the weekdays other than Wednesday, with an uncertain and small number
14 of registrations from one locale is an undiscernible trend. Particularly so given that the VW
15 was registered to a rental company in Virginia Beach, Virginia.

16 To lend weight to claimed reasonable suspicion, BPA Hampson testifies that when
17 Defendant drove past his location, she was seen holding a cell phone in her right hand. By
18 the simple act of being on a cell phone, he concludes that she did so in order to cover her
19 face. His conclusion is soon thereafter belied when he and BPA Ochoa follow Defendant in
20 order to peer into the vehicle she was driving. As Defendant is followed, she looks at them
21 through her rear-view mirror. When they pass her to look into her vehicle, nothing suspicious
22 is seen and she continues to hold the cell phone in her right hand sitting in a relaxed position.

23 BPA Hampson seeks to give additional weight to his reasonable suspicion by
24 characterizing Defendant driving "well below" the lawful speed limit of fifty miles per hour
25 by a mere five miles per hour.  No traffic violations or erratic driving by Defendant was seen.
26 The claimed commonalities of stops occurring in the Willcox area discerned by BPA
27 Gonzales and conveyed to BPAs Hampson and Ochoa, were generalizations which cast
28 suspicion on large segments and entire categories of law-abiding citizens.

Unlike a vehicle appearing heavily loaded despite the vehicle's few occupants, slowing its speed after observing agents, condensation on windows indicating numerous occupants and appearing to be a rental car, which would cumulatively give rise to reasonable suspicion, herein all BPAs Hampson and Ochoa have is a rental vehicle. *See United States v. Purita*, 442 Fed.Appx. 351, *2 (9th Cir. 2011). Unlike observations by agents of a vehicle making apparent efforts to avoid a checkpoint, herein all BPAs Hampson and Ochoa have is being parked for twenty minutes to observe traffic and then seeing Defendant driving past them. *Cf. United States v. Garcia-Barron*, 116 F.3d 1305, 1307 (9th Cir. 1997). BPA Hampson's reliance on Defendant's "driving habits"[7] are unfounded and nonexistent:

> Q. (Defense counsel): That's the only thing that changed. So you - - the only thing that changed in the twenty-five miles between when you pulled out and when you stopped the car was you actually confirmed that the fleet sticker was accurate. So none of the information had changed.
> A. (BPA Hampson): *Besides her driving habits*, no.
> Q. (Defense counsel): Is it illegal to drive five miles under the speed limit?
> A. (BPA Hampson): No.
> Q. (Defense counsel): So my question to you is: Why didn't you just pull the car over when it passed you on Apache Road?
> A. (BPA Hampson): *there was no reason to*.
> Q. (Defense counsel): But nothing had changed between when you saw it pass you up on Apache Pass Road to when you pulled - - well, when you pulled it over, twenty-five miles later.
> A. (BPA Hampson): there was no reason to risk doing a vehicle stop in the winding mountains - - or on the winding road between Apache Pass and - - and Willcox.

(Hampson at p. 32)(emphasis added). This is to say, whatever BPAs Hampson and Ochoa singularly saw at 7:20 a.m. on June 19, 2013 at the T-intersection of Apache Pass Road was an apparent rental vehicle at the near end of shift change of a distant BP checkpoint. The cumulative effect of these two facts does not support any reasonable deductions and inferences and goes beyond the minimal standard of reasonable suspicion found in *Purita*. There was no reasonable suspicion to stop Defendant solely because she was present in an

---

[7] The only driving habits alluded to by BPA Hampson, were being on a cell phone and driving five miles below the speed limit. He agreed neither is against the law. (Hampson at p. 35).

- 13 -

area known for alien smuggling.

**IV. RECOMMENDATION**

For the above-stated reasons, the Magistrate Judge recommends that the District Court grant Defendant's Motion To Suppress/Dismiss For Lack Of Reasonable Suspicion (Doc. 30).

Pursuant to 28 U.S.C. §636(b) and Rule 59 of the Federal Rules of Criminal Procedure, any party may serve and file written objections within ten days after being served with a copy of the Report and Recommendation. If objections are filed, the parties should use the following case number: CR 13–1249-TUC-CKJ.

Failure to file objections in accordance with Fed.R.Crim.P. 59 will result in waiver of the right to review.

DATED this 11th day of October, 2013.

_____
Héctor C. Estrada
United States Magistrate Judge