# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>               Plaintiff,<br><br>v.<br><br>Amanda Henley,<br><br>               Defendant. | No. CR-13-01249-TUC-CKJ (HCE)<br><br>**ORDER** |

On October 15, 2013, Magistrate Judge Hector C. Estrada issued a Report and Recommendation, (Doc. 49), in which he recommended granting Defendant's Motion to Suppress/Dismiss for Lack of Reasonable Suspicion. (Doc. 30). On October 29, 2013, the government filed Objections to Report and Recommendation. (Doc. 70). Defendant filed a Response on November 7, 2013. (Doc. 57).

## I. STANDARD OF REVIEW

The Court reviews *de novo* the objected-to portions of the Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The Court reviews for clear error the un-objected to portions of the Report and Recommendation. *Johnson v. Zema Systems Corp.,* 170 F.3d 734, 739 (7th Cir. 1999); *See also Conley v. Crabtree,* 14 F.Supp.2d 1203, 1204 (D.Or.1998).

## II. FACTUAL BACKGROUND

On August 27, 2013 and September 12, 2013, Magistrate Judge Estrada conducted

an evidentiary hearing. Border Patrol Agents Jeremy Hampton, Diego Omar Ochoa, and Leonardo Gonzales testified for the government. Defendant did not present any witnesses.

Agent Hampton has been employed with the Border Patrol for the past four years. (August 27, 2013 Hearing Transcript at 7) (Doc. 47). He has worked at the Wilcox Border Patrol Station for the past three and a half years. (Doc. 47 at 8). Agent Ochoa was been employed with the Border Patrol for the past five years and has been stationed at the Wilcox Border Patrol Station his entire career. (Doc. 47 at 54).

Prior to June 19, 2013, Agents Hampton and Ochoa were provided with intelligence reports prepared by Agent Leonardo Gonzalez. (Doc. 47 at 12-14, 58); (September 12, 2013 Hearing Transcript at 22) (Doc. 48). Agent Gonzalez is a 14 year veteran of the United States Border Patrol and has been an Intelligence Agent for the past 7 years. (Doc. 48 at 4, 7). He has worked at the Wilcox Border Patrol Station for the past 8 years. (Doc. 48 at 4).

Agent Gonzalez explained as an intelligence agent, he reviews reports generated after an individual is arrested as well as information retrieved from search warrants and interviews with suspects. (Doc. 48 at 4-5). However, he does not keep or consider data or information related to any stops made by Border Patrol Agents in which the individual is released or an arrest is not made. (Doc. 48 at 21). Further, he does not review general information not related to an arrest or investigation. (Doc. 48 at 20-21). After reviewing the information, Agent Gonzalez attempts to identify trends or patterns used by smuggling organizations. (Doc. 48 at 6). Once these trends are discovered, he disseminates his findings to the field agents. (Doc. 48 at 7).

Agent Gonzalez acknowledged that a knowledge of statistics is important to his position but explained that he has never taken any statistics related courses. (Doc. 48 at 14). Agent Gonzalez explained that while he received some training before becoming an intelligence agent, his training only provided him with a "rough idea" on how to analyze the data he reviewed and he adopted his own methods of analyzing data during his time

1 as an intelligence agent.  (Doc. 48 at 16-17).  Agent Gonzalez could not identify any
2 specific criteria or procedures for determining what constituted relevant intelligence that
3 identified a pattern or trend and he primarily relies on his own opinion on what is
4 relevant. (Doc. 48 at 18-19, 29).

5 Agent Gonzalez's intelligence reports primarily identified trends found by him
6 that relate to alien smuggling organizations attempting to circumvent the Route 191
7 Border Patrol checkpoint.  (Doc. 48 at 10).  According to the reports, initially, the alien
8 smuggling organizations were utilizing Highways 181 and 186 to circumvent the
9 checkpoints.  (Doc. 48 at 10).  However, his January 2013 intelligence report indicated
10 that instead of using Highways 181 and 186, the alien smuggling organizations were now
11 utilizing Route 80.  (Doc. 48 at 27).  Agent Gonzalez's reports noted that the vehicles
12 being used to smuggle aliens were driven primarily by Caucasian males or females and
13 usually were found between 6 a.m. to 8 a.m., 11 a.m. to 1:30 p.m., or 6:30 to 8 p.m.
14 (Doc. 48 at 9-10, 12).

15 The intelligence reports indicated that there had been 6 alien smuggling stops on
16 Highways 181 and 186 in the three weeks prior to the Defendant's apprehension.  (Doc.
17 47 at 39).     The June 2013 intelligence report specifically noted that alien smuggling
18 operations were attempting to circumvent the Border Patrol Checkpoint between 6 to 8
19 a.m. or 6:30 to 10:30 p.m. on Tuesdays, Thursdays, or Sundays.  (Doc. 47 at 28, 30).
20 Additionally, the reports noted that the vehicles being used were usually registered out of
21 Phoenix and some were rental vehicles.  (Doc. 48 at 10-11).  However, the rental vehicles
22 were only being used 1/3 of the time.  The remaining 2/3 of arrests involving alien
23 smugglers involved personally owned vehicles.  (Doc. 48 at 11, 26).  Finally, there was
24 never any specific intelligence related to the Defendant or her vehicle. (Doc. 48 at 34).

25 On Wednesday, June 19, 2013, Agents Hampton and Ochoa were working the
26 midnight shift from 12 a.m. to 8 a.m.  (Doc. 47 at 12, 38, 57).  At approximately 7 a.m.,
27 they were seated in their Border Patrol vehicle at the intersection of Apache Pass Road
28 and Highway 186 facing west.    (Doc. 47 at 16-17, 55-56).  Agent Hampton and Agent

1  Ochoa have worked in that area hundreds of times and they are familiar with the area.
2  (Doc. 47 at 9, 55-56).    The area is desolate with very few houses and only one
3  commercial business.  (Doc. 47 at 9, 55-56).  Agent Hampton explained that on a
4  weekday morning, he would expect to observe 4 to 5 vehicles pass the intersection of
5  Apache Pass Road and Highway 186.  (Doc. 47 at 17).  Agent Ochoa's estimate was
6  slightly higher at 5 to 8 vehicles each hour.  (Doc. 47 at 61).

7  Highway 186 is a paved road and a designated historic scenic highway.  (Doc. 47
8  at 67, 69-70).  The Chiricahua National Monument borders Highway 186 and the
9  entrance to the monument is near Apache Pass Road.  (Doc. 47 at 25, 27).  The area near
10 the Chiricahua National Monument is frequented by thousands of tourists every year and
11 while visiting the monument, the tourists would commonly be in rental vehicles on
12 Highway 186.  (Doc. 47 at 26-27, 67-70).

13 On June 19, 2013 at approximately 7 a.m., Agents Hampton and Ochoa observed
14 the Defendant's vehicle travelling north on Highway 186.  (Doc. 47 at 18).  The Agents
15 opined that it was unusual for the Defendant to be travelling north on Highway 186 at 7
16 a.m., because the Chiricahua National Monument was south of the Agent's position.
17 (Doc. 47 at 39, 70).  Further, it was uncommon to observe a tourist visiting the monument
18 on a weekday.  (Doc. 47 at 39, 72).  However, Agent Hampton admitted that he was
19 unfamiliar with the traffic patterns of tourists near the Chiricahua National Monument
20 and Agent Ochoa acknowledged that it was possible that a tourist could have driven past
21 the Chiricahua National Monument and had been driving north on Highway 186 to
22 Interstate 10 at the time of the Agents' observations.  (Doc. 47 at 27, 70).

23 As the Defendant's vehicle passed the agents, they observed two Caucasian
24 women sitting in the front seats of the vehicle.  (Doc. 47 at 18-19).  The driver was
25 holding a cell phone in her right hand, which was covering her face and the passenger's
26 seat was upright.  (Doc. 47 at 18-19).  Agent Hampton observed a sticker on the vehicle
27 indicating that it was a rental vehicle.  (Doc. 47 at 18-19).  Since the vehicle was likely a
28 rental vehicle, the passenger was seated upright in her seat and the driver was blocking

her face using her cell phone, the Agents decided to follow the vehicle to get a closer look. (Doc. 47 at 19-20).

The agents initially followed the vehicle for approximately 25 minutes covering approximately 17 miles. (Doc. 47 at 30). Agent Hampton observed that while he was following the Defendant's vehicle, the driver appeared relaxed and she watched him in her rear view mirror while driving approximately 50 miles per hour. (Doc. 47 at 20-21, 30). After following the vehicle for approximately 25 minutes, the agents drove past the vehicle to look inside, but they did not observe anything suspicious. (Doc. 47 at 20-21, 32). The agents then followed the Defendant's vehicle for another 10 minutes. (Doc. 47 at 31). During this time, the Agents confirmed that the Defendant's vehicle was a rental. (Doc. 47 at 21). After confirming that the vehicle was rented, the agents pulled the Defendant's vehicle over. (Doc. 47 at 21-23). Agent Hampton admitted that prior to stopping the Defendant's vehicle, he never observed the vehicle violate the law and he never observed any contraband in the vehicle. (Doc. 47 at 34-35). The stop was based on the information provided in the intelligence reports regarding alien smuggling operations and the Agents' observations of the Defendant's vehicle. (Doc. 47at 40).

### III.  ANALYSIS

The government objects to Magistrate Judge Estrada's finding that Border Patrol Agents did not have reasonable suspicion for stopping the Defendant's vehicle. "The [Supreme] Court has recognized that a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further." *Hiibel v. Nevada*, 124 S. Ct. 2451, 2458 (2004).

In order to effectuate a lawful stop, the officer must have "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 204 7 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)) see also *United States v. Tiong*, 224 F.3d 1136, 1140 (9th

1 Cir. 2000) ("The quantum of proof needed for reasonable suspicion is less than a
2 preponderance of evidence, and less than probable cause.") (citation omitted).

3       In deciding whether reasonable suspicion existed for a stop, the totality of
4 circumstances must be considered. *United States v. Osborn,* 203 F.3d 1176, 1181 (9th
5 Cir.) (quoting *United States v. Cortez,* 449 U.S. 411, 417 (1981)), cert. denied, 530 U.S.
6 1237 (2000). "All relevant factors must be considered in the reasonable suspicion
7 calculus—even those factors that, in a different context, might be entirely innocuous."
8 *United States v. Fernandez-Castillo*, 324 F.3d 1114, 1117 (9th Cir.) (citing *Arvizu*, 534
9 U.S. at 277–78), *cert. denied*, 124 S. Ct. 418 (2003). "Reasonable suspicion . . . can
10 arise from information different in quality and content and even less reliable than that
11 required for the establishment of probable cause." *United States v. Mattarolo,* 209 F.3d
12 1153, 1157 (9th Cir. ) (citing *Alabama v. White*, 496 U.S. 325, 330 (1990)). "The
13 officer's training and experience are factors to consider in determining if the officer's
14 suspicions were reasonable." *Mattarolo,* 209 F.3d at 1157 (citing *United States v.*
15 *Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996)). "[S]pecific, articulable acts which,
16 together with objective and reasonable inferences, form a basis for suspecting that the
17 particular person . . . is engaged in criminal activity" are required. *United States v.*
18 *Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989) (citation omitted).

19       "In the context of Border Patrol [stops], the factors to be considered in
20 determining whether 'reasonable suspicion' exists to justify stopping a vehicle include,
21 but are not limited to": 1) characteristics of the area; 2) proximity to the border; 3) usual
22 patterns of traffic and time of day; 4) previous alien or drug smuggling in the area; 5)
23 behavior of the driver, including 'obvious attempts to evade officers'; 6) appearance or
24 behavior of passengers; 7) model and appearance of the vehicle; and 8) officer
25 experience. *United States v. Garcia-Barron*, 116 F.3d 1305, 1307 (9th Cir. 1997)
26 (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975)).

27       In this case, the Agents never saw the Defendant commit any traffic violations or
28 any other violations of law prior to stopping her vehicle. The Agents relied upon

1    intelligence reports that were based on information from prior arrests.  Additionally, the
2    Agents relied upon their observations of the Defendant.  These observations included two
3    Caucasian women in the driver and passenger seats of a vehicle driving north on
4    Highway 186 at approximately 7 a.m. in a rented vehicle.

5       The Agents observed that the passenger had her seat upright and rigid.  However,
6    there was no testimony regarding the passenger's behavior or any suspicious activities by
7    the passenger.  The Agents further testified that the driver failed to acknowledge the
8    Agents as she passed them and held cell phone in her right hand, which concealed her
9    face as she passed the Agents.  However, prior to stopping the Defendant's vehicle, the
10   Agents passed Defendant's vehicle on the left and the Defendant made no attempt to
11   switch her phone to her left hand to conceal her face.  Further, the driver appeared
12   relaxed and there was no testimony that her seat was upright or rigid.  Additionally, while
13   the Agents testified that the Defendant failed to acknowledge them as she passed; they
14   also admitted that the Defendant was observing the Agents in her rear view mirror.

15      The Agents testified that they were suspicious because the Defendant was
16   traveling well below the speed limit.  However, the Defendant was driving 50 miles per
17   hour on a road that had a 55 mile per hour speed limit while being followed by a Border
18   Patrol vehicle.  The Defendant never made any attempt to evade the Agents.  The
19   Defendant was driving on Highway 186, which is a paved road and a designated historic
20   scenic highway that leads to the Chiricahua National Monument.  The area near the
21   Chiricahua National Monument is frequented by thousands of tourists every year and
22   there was no testimony regarding what time the Chiricahua National Monument opens for
23   visitors.  The Agents admitted that it was possible that the Defendant had visited the
24   monument earlier that morning and was leaving the area at the time she was stopped.
25   (Doc. 47 at 27, 70).

26      According to the intelligence reports, alien smuggling operations were utilizing
27   Highways 181 and 186 to circumvent a Border Patrol checkpoint.  However, the same
28   reports also provided another alternate route used by alien smuggling operations,

specifically, Route 80. As such, the information in the intelligence reports was not limited to Highways 181 and 186. The intelligence reports provided three different times of day, covering a six hour time period that the alien smuggling organizations were attempting to circumvent the Border Patrol checkpoint and specifically noted that the smuggling organizations were attempting to smuggle aliens on Tuesdays, Thursdays and Sundays. However, while the Defendant was stopped during one of the three time frames referenced in the intelligence reports, she was stopped on a Wednesday, which did not match the information in the intelligence report.

Further, while the intelligence reports referenced the use of rental vehicles one third of the time, the majority of the time, the vehicles were not rented. The reports noted that the vehicles were usually registered out of Phoenix. However, there was no testimony that the Defendant's vehicle was registered out of Phoenix and in fact the license plate check came back to a rental company out of Virginia.[1]

Based on the use of the intelligence reports in this case and the Agents' observations, the Agents could have stopped any vehicle whether personally owned or rented, regardless of where the vehicle was registered, on any day of the week, during any one of three two hour time periods that was being driven by a Caucasian man or woman, as long as the vehicle was driving on one of three roadways in the area. While the Court acknowledges that the Agents had a combined nine years of experience working at the Wilcox Border Patrol Station and the area of the stop was near the border and well known for alien smuggling, these factors fail to establish reasonable suspicion based on the totality of the circumstances in this case.

---

[1] The government argues that the Court should ascribe more weight to the fact that the Defendant was in a rental vehicle. However, the Agent's own testimony contradicts the importance of the rental vehicle. While the Agents testified that they have stopped a lot of alien smugglers using rental vehicles, the intelligence reports indicate that alien smugglers use personally owned vehicles twice as often as rental vehicles. The fact that the Agents do not routinely see rental vehicles on a weekday morning does not establish reasonable suspicion to stop the Defendant's vehicle especially in light of the fact that the Highway where the Defendant was observed driving leads directly from a National Monument routinely visited by tourists.

The Court finds that after an independent *de novo* review of the evidence, the Agents' observations taken in conjunction with the intelligence reports did not rise to the level of reasonable suspicion necessary to stop the Defendant's vehicle.

Accordingly, IT IS ORDERED:

1. The Report and Recommendation is ADOPTED. (Doc. 49).

2. Defendant's Motion to Suppress/Dismiss for Lack of Reasonable Suspicion, (Doc. 30), is GRANTED.

Dated this 17th day of December, 2013.

_____
Cindy K. Jorgenson
United States District Judge